Filed 4/1/20

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION THREE

| | |
|---|---|
| TERESA McPHERSON et al., | B290869 |
| Plaintiffs and Respondents, | Los Angeles County Super. Ct. No. BC609090 |
| v. | |
| EF INTERCULTURAL FOUNDATION, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Raphael, Judge.  Affirmed in part and reversed in part with directions.

Seyfarth Shaw, Christian Rowley, Candace Bertoldi and Kiran A. Seldon for Defendant and Appellant.

Law Offices of Courtney M. Coates and Courtney M. Coates for Plaintiffs and Respondents.

---

\*      Under California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2.d., 3, 5, and 6 of the Discussion.

Paul Hastings, Paul W. Cane, Jr., Zachary P. Hutton and Brian A. Featherstun for California Employment Law Council and Employers Group as Amici Curiae on behalf of Defendant and Appellant.

---

**INTRODUCTION**

When an employer's policy allows an employee to take an unspecified amount of paid time off without accruing vacation time, does the employee's right to that paid time off vest so the employer must pay her for unused vacation under Labor Code section 227.3[1] when her employment ends? Or does section 227.3 apply only to policies providing a fixed amount of vacation that accrues over time? That is the primary issue posed by this appeal by EF Intercultural Foundation, Inc. (EF) from the trial court's judgment awarding vacation wages to three of EF's former exempt employees—Teresa McPherson, Donna Heimann, and Linda Brenden.

In the published portion of this opinion, we conclude section 227.3 applies to EF's purported "unlimited" paid time off policy based on the particular facts of this case. We by no means hold that all unlimited paid time off policies give rise to an obligation to pay "unused" vacation when an employee leaves. Flexible work arrangements and unlimited paid vacation policies may be of considerable benefit to employees and to the employers who want to recruit and retain those employees. Employees and employers are free to contract for unlimited paid vacation, consistent with the Labor Code and governing case law. Here, however, EF never told McPherson and her fellow plaintiffs that

---

[1] Undesignated statutory references are to the Labor Code.

2

they had *unlimited* paid vacation. EF had no written policy or agreement to that effect, nor did its employee handbook cover these plaintiffs. As it turned out, McPherson, Heimann, and Brenden took less vacation than many of EF's other managers and exempt employees covered by the employee handbook, whose accrued vacation vested as they worked for EF month after month.

As to Heimann only, we reverse the judgment and remand the case to the trial court to recalculate the amount of vacation wages owed her, excluding vacation wages earned after she moved to Virginia in 2005.[2] We affirm the judgment in all other respects, addressing EF's additional contentions in the unpublished portions of the opinion.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts established by the record in the light most favorable to the judgment. (*Los Angeles Unified School Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 194, fn. 1.)

1. ***The parties***

EF is a foreign corporation authorized to do business in California. EF Educational Homestay Program (EHP) is a division of EF. EF is a nonprofit that runs educational and cultural exchange programs between the United States and other countries. EHP primarily operates out of EF's main office in Cambridge, Massachusetts.

EHP employs full-time "area managers" on the east and west coasts to run seasonal homestay programs for international students in their regions. Area managers work from home and

---

[2] We also remand to the trial court to consider whether to modify the attorney fee award to plaintiffs.

3

in the field. They hire, train, and work with a staff to recruit host families for the students and to operate the programs. Programs mainly run in the summer, but some regions also hold shorter winter programs.

Plaintiffs were full-time, exempt, salaried EF employees who worked in the EHP division.[3] Brenden worked as an area manager from 2005 to September 2015. She requested severance when her employment was terminated. She ultimately received three months' severance and signed a severance agreement that included a general release of claims.

Heimann was an area manager from 1995 to 1998. She became EHP's west coast manager in charge of transportation and excursions[4] in 1998. Although Heimann moved to Virginia in 2005, she continued to work for EHP in that same role until she retired on October 31, 2014. Heimann worked from home in Virginia, but traveled to California annually as part of her job. She stayed in Southern California from mid-June through August when the summer program was underway, and returned at the start of the year and in spring or fall for trainings and meetings.

Heimann wanted to take time off before she retired. EHP's then-president Matthew Smith agreed she could take 20 days. When Heimann was able to take only six days of vacation before

---

[3]    Plaintiffs had worked part-time or seasonally for EHP—between three and 10 years—before becoming full-time, salaried employees.

[4]    We refer to both area managers and the west coast manager as "area managers." The same vacation policy applied to both positions.

4

she retired, Smith agreed to pay her for the 14 remaining days as "vacation pay."

McPherson worked as an area manager from 2003 to 2004 and again from 2005 to 2014. From late 2014 to fall 2015, McPherson worked in an administrative "program support" position as part of a one-year pilot program (program manager). EHP did not have the budget to extend the program manager position past September 30, 2015, when it was set to expire. McPherson sent EHP a proposal to retain her in a new position for the next season. On September 23, 2015, EHP's president Robert Hart left McPherson a voicemail that he needed more time to consider the proposal. EHP continued to pay McPherson in October 2015.

On November 6, 2015, Hart told McPherson that EHP had no budget for her proposed position for the 2015-2016 season. Hart then sent her a severance agreement/termination letter on November 19, 2015, stating her employment with EHP had ended as of September 30, 2015.

2. *EF's Vacation Policy*

EF has an employee handbook. It covered EHP employees who worked at the main office in Cambridge and "bosses," such as regional directors, as well as operations managers. The 2014 handbook contains a vacation policy that provides salaried employees with a fixed amount of vacation days per month based on their length of service.[5] Employees could carry over 10 accrued, unused vacation days from one year to the next. If an employee carried over more than 10 accrued vacation days, EF

---

[5] An earlier version or versions of the handbook included the same or a similar vacation policy.

paid the employee 70 to 100 percent of the value of those days.[6] Once an employee reached the maximum of yearly accruable vacation plus the 10 carryover days, the employee no longer accrued vacation until he or she used a portion of the accrued time. Employees subject to this policy were required to use an online scheduling tool that kept track of their accrued vacation balance to request and obtain approval for vacation.

This accrued vacation policy did not apply to area managers or the west coast manager. Instead, plaintiffs could take time off with pay, but they did not accrue vacation days. Area managers did not use the online system to request time off or to track the number of days they had taken. Instead, they were required to notify their supervisors before taking time off. Taking time off during EHP's peak season was "strongly discouraged," but was approved in some circumstances.

### 3. *Plaintiffs' complaint*

On February 3, 2016, plaintiffs sued EF alleging it failed to pay them accrued but unused vacation wages. McPherson also alleged EF failed to pay her regular wages earned in November 2015. The complaint asserts causes of action for (1) violation of Labor Code section 227.3 (denial of vacation wages), (2) breach of implied contract, (3) breach of the implied covenant of good faith and fair dealing, (4) violation of Labor Code sections 201 and 203 (unpaid wages at discharge and waiting time penalties), and (5) violation of Business and Professions Code section 17200 et seq. (unfair competition).

In February 2017, EF moved for summary judgment. Plaintiffs shifted the focus of their legal theory for recovery of

---

[6] Employees residing in California who paid California payroll taxes were paid 100 percent of the value of that time.

accrued vacation wages under section 227.3 from EF's express vacation policy to EF's unwritten policy of providing plaintiffs "unlimited" vacation, contending it was a "*de facto* 'use it or lose it' policy." The court granted summary adjudication on plaintiffs' claim for breach of the covenant of good faith and fair dealing, but otherwise denied EF's motion.

**4.** ***Bench trial and court's statements of decision***

The case proceeded to a bifurcated bench trial. The liability phase took place in June 2017. After filing posttrial briefs, the parties presented closing arguments on October 20, 2017. On December 11, 2017, after issuing a tentative ruling and considering further submissions from the parties,[7] the court issued its statement of decision on the first phase of the trial, finding EF liable for vacation wages. On March 12, 2018, following the second phase of the trial on damages—conducted by documents and oral argument—the court issued its tentative decision, which reconsidered parts of its first statement of decision on liability and addressed plaintiffs' damages.[8]

---

[7] When it issued its December 11 statement of decision, the court had not seen some of the parties' additional briefing, including EF's proposed statement of decision as to controverted issues not addressed in the court's tentative ruling. The court considered the mistakenly missed briefing when it issued its statement of decision on the second phase of the trial.

[8] The trial court ordered plaintiffs to prepare a "portion of a statement of decision" calculating their damages based on the court's findings. The court stated the combination of its tentative ruling and plaintiffs' proposed statement of decision would serve as the proposed statement of decision for the second phase of trial. That became the final statement of decision under rule 3.1590 of the California Rules of Court.

a. *Plaintiffs' entitlement to vacation wages under EF's policy*

In its first statement of decision, the trial court termed EF's policy of providing vacation time that did not accrue as an "undefined" rather than an "unlimited" vacation policy. The court reasoned "[p]laintiffs' vacation requests here needed to be approved, there is no evidence that more than a typical amount of vacation was requested or approved, and no one told plaintiffs that they had the right to take any large amount of vacation. It appears to the Court that the parties proceeded on an understanding that the policy was that plaintiffs had the right to take an amount of approved vacation that was within the amounts typical of most jobs at the company—perhaps the amount in the employee handbook—even if there was no precise amount expressly stated or agreed upon."

The court then concluded "vacation time vests under a policy where vacation time is provided, even if the precise amount is not expressly defined by the employer in statements to employees." It found "EF had a 'policy [that] provides for paid vacations' under section 227.3." The court reasoned that, "[b]ecause vacation time vests under California law if an employee is told the *precise* amount she has a right to (e.g., 'two weeks annually'), it does not make sense that vesting can be avoided if the employee would in fact receive the *same* amount if she asked for it, but is simply not told that precise amount would be approved. Either way, the employer has a policy of providing at least that much vacation." The court found "there could be no dispute that plaintiffs would receive (at least) a couple of weeks of paid vacation annually under EF's policy, and there likewise could not be a serious belief that EF would approve as much as several months[ ] of paid vacation—the plaintiffs would not have dared ask for anything like that. [¶] If a policy of undefined

vacation could avoid vesting, an employee could lose compensation that another identically situated employee was given, contrary to California law that vacation is to be treated as a wage."

The court further reasoned "offering vacation time in an undefined amount simply presents *a problem of proof* as to what the employer's policy was. That policy is implied through conduct and the circumstances, rather than through an articulated statement. The Court must determine the amount of vacation time that the employer's policy actually made available to plaintiffs, if necessary using principles of 'equity and fairness' (section 227.3) based on the circumstances." (Footnote omitted.)[9]

The court initially found that "EF's policy was to approve the amount of vacation provided in the employee handbook for plaintiffs, even though EF may not have expressly stated that amount would be approved." It thus concluded plaintiffs could "recover vacation as proven under the policy in EF's employee handbook, including the cap on accrual."

In its second statement of decision, the court reconsidered this conclusion. The court noted "[p]laintiffs testified that, through about forty work-years in total for the three of them, they actually were approved to take between one and twenty vacation days per year." Based on that testimony, the court concluded that "[s]ince twenty days' annual vacation was

---

[9]    The court noted section 227.3 requires the Labor Commissioner to apply the " 'principles of equity and fairness' to resolve 'any dispute with regard to vested vacation time.' " The court concluded section 227.3 therefore also permitted the court to "use equity and fairness to determine, for purposes of vesting, the amount of vacation time that an employer's policy allowed."

approved at least once, . . . at least that much vacation was actually available to plaintiffs under the EF policy applied to them."

The court determined application of the employee handbook's vacation policy to plaintiffs was "not the best course in this case." It noted the parties' second-phase arguments "concern[ed] the application of the statute of limitations to the annual 'payouts' [of vacation accrued over the carryover limit] under the handbook policy." The court concluded the application of the statute of limitations "in this situation seems too arbitrary to best serve the purpose of determining what amounts of vacation actually vested," noting neither EF nor plaintiffs "thought at the time that the handbook actually applied to the plaintiffs."

The court concluded "the best approach is a more straightforward one: 20 days of vacation vested annually for each plaintiff, and any unused portion is payable at termination. See *Church v. Jamison* (2006) 143 Cal.App.4th 1568." The court based its conclusion on law and equity under section 227.3. As a legal determination, the court found the evidence demonstrated 20 days' annual vacation was available to plaintiffs under EF's policy. Under principles of equity and fairness, the court stated it was "attempting to provide plaintiffs with adequate compensation for unused vacation time, without over-compensation, in circumstances where the amount of vacation time available was not expressly defined."

b. *Brenden's release and severance*

At trial EF argued Brenden's claims were barred by the written release of known and unknown claims she signed as a condition of her severance. The court concluded section 206.5,

10

subdivision (a)[10] rendered Brenden's purported release of her vacation wage claims " 'null and void' " because "there was no vacation-pay dispute that was being settled at the time of the release." The court acknowledged the statute "has been interpreted as meaning, 'wages are not "due" if there is a good faith dispute as to whether they are owed.' " The court found the case law also supported its interpretation that a release is invalid under section 206.5 if it "pre-emptively waives then-unrecognized claims," as was the case here.

The court also rejected EF's contention Brenden's damages should be reduced by the $11,362.50 severance payment because it was consideration for the release of wage claims the court had found invalid. The court found persuasive Brenden's argument that the severance amount paid her also to release non-wage claims and thus she need not return it.

c.     *Heimann's Virginia residency*

EF argued California's wage and hour laws did not apply to Heimann because she lived in Virginia. The court agreed with EF that California's wage and hour laws do not cover all work with some connection to California. But it disagreed "that the standard is so high that the employee's work must be 'entirely' in California." The court had "no doubt" that Heimann was covered by California's employment laws. It found her work was focused

_____

[10]     Section 206.5, subdivision (a) provides: "An employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee. Violation of this section by the employer is a misdemeanor."

11

on people and activities in California and required her to reside temporarily in California for significant periods.

d. *McPherson's salary*

EF argued McPherson's employment ended September 30, 2015, when her program manager contract expired. McPherson argued it ended November 19, 2015, when she received her termination letter. The court concluded EF terminated McPherson's employment on November 6, 2015, the day EF management told her she would not be continuing with the company, and it owed her unpaid wages from November 1 through November 6, 2015. The court found that—had EF intended McPherson's employment to end on September 30, 2015, even while it considered her proposal for a new position— "it merely had to either (a) expressly tell her that or (b) make a decision on extending her by September 30, rather than taking until November to do so." The court also found EF's payment of McPherson's salary in October 2015 "an important reason why an objective employee in McPherson's position would have concluded she was still employed."[11]

e. *Amount of unused vacation wages owed*

EF did not track the number of vacation days plaintiffs used during their employment. Plaintiffs did not use the online tracking system that employees subject to the handbook's vacation policy used. The court found Heimann "highly credible." It adopted her testimony on the number of vacation days she took during her employment.

---

[11] The court concluded EF did not owe McPherson waiting time penalties on the unpaid wages. EF had a good faith belief that wages were not owed based on the expiration of McPherson's contract on September 30, 2015.

The court found Brenden and McPherson credible, but was "less convince[ed] that their recollection and accounts of their vacation usage should be credited wholesale." Without recordkeeping, there was no way for the court to determine "with certainty" the amount of vacation each actually took. The court found "eight days' vacation are to be added to each of the amounts that these two plaintiffs recall that they took each year, to best reflect how much vacation she actually took, based on their testimony."

The court concluded plaintiffs were not owed waiting time penalties. The court found EF had a reasonable, good faith belief that vacation wages were not owed, as no California authority specifically has addressed "undefined-amount vacation policies."

The court ordered plaintiffs to prepare a proposed statement of decision calculating the mathematical application of the court's findings to determine each plaintiff's damages.

5.    *Judgment and appeal*

On April 17, 2018, the court entered judgment in the total sum of $88,594.65, including prejudgment interest, in favor of plaintiffs. McPherson was awarded $9,780.98 in regular and vacation wages and interest; Heimann was awarded $52,149.10 in vacation wages and interest; and Brenden was awarded $26,664.57 in vacation wages and interest.[12] On May 17, 2018, the court awarded plaintiffs $397,742.33 in attorney fees. On June 20, 2018, EF filed a notice of appeal from the April 17 judgment.

---

[12]    The vacation wages were based on 44.27 days of accrued vacation for McPherson, 199.7 days for Heimann, and 106 days for Brenden.

13

EF filed a motion with its reply brief asking us to take judicial notice of documents that are part of the legislative history of section 227.3.  EF argued the documents are necessary to respond to plaintiffs' contentions about the meaning of " 'accrued' " and " 'vested' " and the statute's provision about " 'principles of equity and fairness.' "  Plaintiffs opposed the motion, asserting EF did not introduce the documents in the trial court, the plain language of section 227.3 is unambiguous, and the letters and statements from individual legislators EF submitted are not proper subjects for  judicial notice.  We deferred our ruling pending consideration of the merits of EF's appeal.  We now grant EF's motion and take judicial notice of the exhibits attached to its application.

## DISCUSSION

EF asks us to reverse the judgment because (1) California law does not prohibit " 'unlimited' or 'uncapped' time off policies like EHP's"; (2) neither EHP's policy nor the parties' contracts gave plaintiffs "vested vacation rights"; and (3) the trial court "arbitrarily created vested vacation rights" and "adopt[ed] an incorrect and unworkable legal standard."  EF also asks us to reverse the judgment on the separate grounds (a) as to Brenden that she released her vacation wage claims, (b) as to Heimann that section 227.3 did not apply to her after she moved to Virginia in 2005, and (c) as to McPherson that she is not entitled to unpaid wages from November 2015 because her employment ended September 30, 2015, and she performed no work in November 2015.

1.    ***Standard of Review***

On appeal from a judgment based on a statement of decision after a bench trial, we review the trial court's conclusions of law de novo and its findings of fact for substantial evidence.  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

14

Under the deferential substantial evidence standard of review, we "liberally construe[ ]" findings of fact "to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid.*) "We may not reweigh the evidence and are bound by the trial court's credibility determinations." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) Testimony believed by the trial court "may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable *per se*," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' " (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.) " 'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.' " (*Estate of Young*, at p. 76.)

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) "Under the doctrine of implied findings, the reviewing court must infer . . . that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.) We affirm a judgment if correct on any ground. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.)

We review questions of statutory construction de novo. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1251 (*Kirby*).) "Our primary task when faced with a question of statutory construction is to determine the intent of the Legislature, and we begin by looking to the statutory language. . . . 'The words of the statute must be construed in context, keeping in mind the statutory purpose.' " (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 (*McCarther*).)

15

" ' "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citations.] In reading statutes, we are mindful that words are to be given their plain and commonsense meaning. [Citation.] We have also recognized that statutes governing conditions of employment are to be construed broadly in favor of protecting employees.' " (*Kirby, supra*, 53 Cal.4th at p. 1250.)

**2.** ***The court did not err when it concluded EF owed plaintiffs vacation wages under section 227.3***

EF styles the legal question before us as "whether EHP's practice of permitting [p]laintiffs to take 'uncapped' time off without accruing vacation wages complies with California law." It argues that if we conclude this practice is lawful, then EF had no obligation to pay plaintiffs vacation wages at their termination because "nothing 'vested' in the first place." In essence, we must determine if EHP's policy to provide certain employees unaccrued paid time off is subject to section 227.3. On the particular, unusual facts of this case, we conclude it is.

a. *Section 227.3 and the case law interpreting it*

No California authority has addressed whether a nonaccrual, unlimited paid time off[13] policy is subject to section 227.3. We first describe current California law on paid vacation policies.

---

[13] We refer to "paid time off" and "vacation" interchangeably. (See Dept. of Industrial Relations, Div. of Labor Standards Enforcement (DLSE) Opn. Letter No. 1990.09.24 (Sept. 24, 1990) p. 3, archived at <https://perma.cc/DJ4Q-NTCL> ["Any employer policy which provides leave time is presumed to be vacation unless clearly defined otherwise."].)

California law does not require employers to provide employees with paid vacation.  (*Owen v. Macy's, Inc.* (2009) 175 Cal.App.4th 462, 468 (*Owen*).)  "[W]henever" an employer does have a policy of providing its employees with paid vacation, however, section 227.3 requires the employer to pay as wages any "vested" vacation time a terminated employee has not used.  Section 227.3 provides,

> "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination.  The Labor Commissioner or a designated representative, in the resolution of any dispute with regard to vested vacation time, shall apply the principles of equity and fairness."

Our Supreme Court addressed the question of *when* the right to vacation " 'vest[s]' " under section 227.3 in *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 776 (*Suastez*).  The Court held, "The right to a paid vacation, when offered in an employer's policy or contract of employment, constitutes deferred wages for services rendered.  Case law from this state and others, as well as principles of equity and justice, compel the conclusion that a proportionate right to a paid vacation 'vests' as the labor is rendered.  Once vested, the right is protected from forfeiture

17

by section 227.3. On termination of employment, therefore, the statute requires that an employee be paid in wages for a pro rata share of his vacation pay." (*Id.* at p. 784.)

There, the company's policy permitted employees to take one to four weeks of paid vacation annually depending on their length of employment, but employees were not eligible to take vacation until the anniversary of their employment. (*Suastez, supra*, 31 Cal.3d at p. 776 & fn. 2.) When plaintiff's employment ended before his anniversary date, the company refused to pay him any pro rata share of vacation for that year. (*Id.* at p. 777.)

The company argued employees terminated before their anniversary date had no right to vacation pay under section 227.3 because employment on that date "is a condition precedent to the 'vesting' of vacation rights." (*Suastez, supra*, 31 Cal.3d at p. 778.) The employee contended annual vacation is earned by work performed throughout the year and vests as it is earned. (*Id.* at p. 779.)

The Court agreed with the employee. It noted vacation pay "is, in effect, additional wages for services performed." (*Suastez, supra*, 31 Cal.3d at p. 779.) The Court explained, "The consideration for an annual vacation is the employee's year-long labor. Only the time of receiving these 'wages' is postponed." (*Ibid.*) In other words, "vacation pay is simply a form of deferred compensation." (*Id.* at p. 780.) The Court likened "vacation pay" to "pension or retirement benefits, another form of deferred compensation" the right to which " 'vests upon the acceptance of employment [citations], even though the right to immediate payment of a full pension may not mature until certain conditions are satisfied.' " (*Ibid.*)

The Court recognized that "since the consideration for an annual vacation is the labor performed throughout the year, an employee whose employment is terminated midyear has not

18

earned a full vacation.  Nonetheless, the employee has earned *some* vacation rights ' "as soon as he has performed substantial services for his employer." ' " (*Suastez, supra*, 31 Cal.3d at p. 780.)  The Court explained that because the "right to some share of vacation pay vests, like pension rights, on acceptance of employment," the "[n]onperformance of a condition subsequent, such as [the company's] requirement that employees remain until their anniversary, can, at most, result in a forfeiture of the right to a vacation; it cannot prevent that right from vesting." (*Id.* at p. 781.)  Because section 227.3 prohibits forfeiture of vested vacation time on termination, the company's policy was impermissible.  (*Suastez*, at p. 781.)

The company nevertheless argued its eligibility requirement was  "a condition precedent that prevents those rights from vesting at all." (*Suastez, supra*, 31 Cal.3d at pp. 781-782, italics omitted.)  The Court rejected that contention, reasoning "once it is acknowledged that vacation pay is not an inducement for future services, but is compensation for past services, the justification for demanding that employees remain for the entire year disappears." (*Id.* at p. 782.)  Moreover, the Court interpreted the passage in section 227.3 that "all vested vacation shall be paid to [the employee] . . . in accordance with [the] contract of employment or employer policy respecting eligibility or time served" to mean "the *amount* of vacation pay an employee is entitled to be paid as wages," not the time of vesting as the company had argued.  (*Id.* at pp. 782-783.)

Because "vacation pay vests as it is earned, under . . . section 227.3," after *Suastez*, employer policies such as those " 'allowing the forfeiture of vacation pay before one full year of service or which require[ ] employees to "use or lose" vacation pay by a specific date' " are prohibited.  (*Owen, supra*, 175 Cal.App.4th at pp. 469-470.)  Employers legitimately may limit

19

the amount of vacation pay an employee accrues, however, by precluding accrual of additional vacation time once employees have reached an announced maximum. (*Boothby v. Atlas Mechanical, Inc.* (1992) 6 Cal.App.4th 1595, 1602 (*Boothby*).) Under such a " 'no additional accrual' policy," the employee does not forfeit vested vacation pay because "no more vacation is earned" once the maximum is reached; thus, "no more vests." (*Ibid.*)

An employer also may adopt a policy that expressly provides new employees do not earn vacation time "during their initial employment." (*Owen, supra*, 175 Cal.App.4th at p. 464; *Minnick v. Automotive Creations, Inc.* (2017) 13 Cal.App.5th 1000, 1003.) Again, because "no vacation pay is earned" during the waiting period, "none is vested." (*Owen*, at p. 464.) Under such a policy, "employees cannot claim any right to vested vacation during their initial employment, because they know in advance that they will not earn or vest vacation pay during this period." (*Id.* at p. 465.)[14] But "once an employee becomes eligible to earn vacation benefits he or she is simultaneously entitled to payment for unused vacation upon separation." (*Minnick*, at p. 1007.)

---

[14] The policies found permissible in both *Owen* and *Minnick* expressly provided in writing that new employees did not earn vacation until after they had been employed for a specific length of time. (*Owen, supra*, 175 Cal.App.4th at p. 465 [employees " 'earn and vest in paid vacation <u>after they have completed six months of continuous employment</u>' "]; *Minnick, supra*, 13 Cal.App.5th at p. 1002 [" 'You must complete one year of service with the company to be entitled to one week vacation.' "].) "[T]he policy language reasonably inform[ed] employees that their vacation accrual begins after the completion of" the stated period. (*Minnick*, at p. 1008.)

b.  *Section 227.3 applies to EF's policy because it was neither unlimited in practice nor conveyed as unlimited*

It is undisputed EF had a policy of providing paid vacation or time off to area managers, including plaintiffs, triggering the first prong of section 227.3: "whenever . . . [an] employer policy provides for paid vacations . . . ." It also is undisputed that EF did not promise plaintiffs a specific amount of paid vacation that they would accrue over time or expressly tell them they were limited to a maximum amount of paid time off. EF and amici contend the second prong of section 227.3—"and an employee is terminated without having taken off his vested vacation time"— does not apply to unlimited vacation policies because no vacation time vests "if there is no fixed vacation bank." In other words, they contend an accrued, fixed amount of vacation time is a precondition to the vesting of vacation wages.

Once EF opted to provide plaintiffs with paid vacation, by default that paid time off constituted additional wages attributable to the services plaintiffs rendered during the year, vesting as they labored under *Suastez*. (*Suastez, supra*, 31 Cal.3d at pp. 779, 782, 784; see *Minnick, supra*, 13 Cal.App.5th at p. 1007 [under *Suastez* "all vacation pay is vested when earned"].) EF argues plaintiffs earned no vacation time—and thus none vested—to invoke section 227.3 because they did not labor "in exchange for a promise of a specific amount of vacation," as in *Suastez*.

Under *Owen, Minnick*, and *Boothby*, an employer's policy certainly may limit an employee's ability to earn vacation during a specified period—whether at the start of employment or after a certain amount of vacation time has accrued. No vacation wages vest during such a period because the employee earns no vacation during that specified time. (*Owen, supra*, 175 Cal.App.4th at

21

pp. 464, 471-472; *Minnick, supra*, 13 Cal.App.5th at p. 1002; *Boothby, supra*, 6 Cal.App.4th at p. 1602.)[15] It is unclear,

[15] EF and amici rely on *McCarther, supra*, 48 Cal.4th 104 in support of their contention that section 227.3 does not apply to unlimited vacation policies. There, our Supreme Court held a sick leave policy that provided an uncapped number of paid days off was not subject to section 233 because employees did not " 'accrue[ ] increments of compensated leave.' " (*McCarther,* at p. 116.) Section 233 requires employers who provide paid sick leave to allow employees "to use . . . accrued and available sick leave . . . in an amount not less than the sick leave that would be accrued during six months at the employee's then current rate of entitlement" to care for an ill family member. (§ 233, subd. (a); *McCarther*, at pp. 110-111.) The statute defines sick leave as "accrued increments of compensated leave." (§ 233, subd. (b)(3)(A).) The Court interpreted the term " 'accrued' " to have the "commonsense meaning of 'accumulated.' " (*McCarther*, at p. 115.)

We do not find *McCarther*'s analysis of uncapped paid sick leave applicable to the vacation policy before us. First, section 233 plainly states it applies only to sick leave policies with "accrued increments of compensated leave." In contrast, the plain language of section 227.3 does not require vacation time to be accrued incrementally. Nor does section 227.3—unlike section 233—require vested vacation time to be calculated based on a precise, stated formula. The Court in *McCarther* concluded the Legislature intended to limit section 233 "to employers that provide a measurable, banked amount of sick leave," rather than uncapped sick leave, because the statute requires the amount of sick leave employers must allow employees to use for kin care to be calculated using a precise formula based on accrued time. (*McCarther, supra*, 48 Cal.4th at p. 111.) Finally, paid sick leave is conditional; paid vacation is not. Sick leave does not vest until the qualifying event—the employee's illness—occurs. An employee's right to paid time off, in contrast, has no preconditions; it vests as the employee labors. (See *Paton v.*

however, whether an employer that has a paid time off policy may limit an employee's ability to earn vacation indefinitely. (The policies in *Owen* and *Minnick* did not permit employees to earn vacation for an initial probationary period—their first six and 12 months, respectively.) But once paid vacation is offered, any limit on an employee's entitlement to it must be expressed in a clear, written policy from the get-go. (*Owen,* at pp. 464-465; *Minnick,* at p. 1002; cf. *Boothby, supra*, 6 Cal.App.4th at p. 1598 ["accumulation of vacation time does not depend on an agreement which expressly *permits it*[;] . . . unused vacation accumulates unless the employment agreement legally *prevents* it"].)

In any event, we need not decide whether vacation wages are earned under an unlimited policy—whether "uncapped time off equate[s] to 'vested vacation' "—as that is not the policy here. Not only was EF's policy not in writing, but the record demonstrates EF never told plaintiffs it had an "unlimited" vacation policy or that their paid time off was not part of their compensation. EF may call its vacation policy "unlimited" or "uncapped," but substantial evidence supports the trial court's finding that it was not.

---

*Advanced Micro Devices, Inc.* (2011) 197 Cal.App.4th 1505, 1519 [unlike paid vacation, other types of paid leave, such as sick leave, bereavement leave, or paid holidays vest upon the occurrence of an event or condition or are limited to use for a specific purpose].) Moreover, because paid sick leave is not considered a form of "wages," employers are not required to pay employees their unused sick leave on termination—accrued or not. (§ 246, subd. (g)(1).) In any event, we need not decide whether section 227.3 is sufficiently similar to section 233, as we conclude EF's policy was not unlimited.

### i. *EF's vacation policy had an implied limit*

EF's policy in practice was to give plaintiffs some fixed amount of vacation time. As the court said, EF expected plaintiffs to take vacation in the range typically available to corporate employees (such as two to six weeks), not an "unlimited" amount—for example, more than would be available under a traditional accrual policy—along the lines amici describe.[16] See part 2.c. *post*. The trial testimony supports the court's finding.

EHP operations manager Nicole Halverson testified she expected area managers would take "between two and four weeks" of vacation per year. When the court asked Halverson if area mangers, in her experience, ever took more than four weeks off, she responded, "potentially." She could not say with certainty, however, whether she was aware of any area managers who had taken more than four weeks off. She believed one of her area mangers may have "gotten somewhat close to that." Smith also approved 20 days (four weeks) of vacation for Heimann before she retired; he believed that amount was reasonable and

---

[16] By "unlimited," we do not suggest EF intended to permit area managers to take vacation 365 days a year. After all, the premise behind vacation pay is that it is deferred payment for the employee's *labor*. And, as our Supreme Court has acknowledged, section 227.3 "does not purport to limit an employer's right to control the scheduling of its employees' vacations." (*Suastez, supra*, 31 Cal.3d at p. 778, fn. 7.) But as amici have described them, and the trial court noted, one would expect unlimited time off policies at least to afford employees the ability to take longer or more frequent periods of time off than a traditional accrual policy or allow employees to work fewer hours in lieu of having more vacation days.

wanted "to make the last few months that she was working with [EHP] good."

Plaintiffs—who collectively worked for a total of almost 40 years—presented evidence they took about two weeks of vacation each year on average,[17] but the record established they never sought or received more than four weeks (20 work days), as the trial court found. Moreover, substantial evidence supports the court's implicit finding that plaintiffs' schedules precluded them from taking advantage of EF's purported unlimited time off policy. (Cf. Dept. of Industrial Relations, DLSE Opn. Letter No. 1991.01.07 (Jan. 7, 1991) p. 2, archived at <https://perma.cc/8PTR-GKBU> [where policy places a cap on the accumulation of accrued vacation, " 'an employee must be given a fair opportunity to take vacation at reasonable periods of time so that he or she can stay below the cap and continue vacation accruals' "].)

For example, the trial court asked Heimann why she took two weeks of vacation each year rather than four weeks or something else. She responded, "Basically, it was approximately all the time I could take off based on my schedule. And I knew I was entitled to at least two weeks off because no one ever told me exactly how much vacation time I had." She also testified that it would have been "nice to be able to take unlimited time off," but professed "the restrictions of the job probably wouldn't

---

[17] According to their testimony and trial exhibits, plaintiffs took fewer than two weeks in some years—e.g., six to nine days— and more than two weeks in others—e.g., 11 to 14 days. Brenden took less vacation on average than the other plaintiffs because her husband's busy season and children's school schedule prevented her from taking vacation during EF's nonpeak season.

have allowed [her] to take unlimited time off because [she] would not have been able to complete all [her] duties."

McPherson testified similarly: "We were allowed to take vacation and get paid for that vacation. Certainly wasn't unlimited and to the contrary it was very difficult to take much vacation at all due to the rigors of the job." Former EHP regional director Joyce Dallam, who supervised area managers, testified, "It was very difficult for anyone to take any extended period of time. And most times, . . . [area managers] would take days added onto trips that the company gave us." For example, area managers often added three or four extra days to the company's annual November conferences, held in attractive travel destinations.

The testimony also established that EHP's "peak season" started around April and lasted until the middle or end of August. Some regions, including McPherson's and Brenden's, also ran shorter winter programs in December, January, and/or February. During the peak season plaintiffs worked more than 100 hours a week, seven days a week, up to 18 hours per day. Although plaintiffs' heaviest workload was during the April to August peak season, they presented evidence they worked full-time all year. Plaintiffs may have had more flexibility to take time off in the nonpeak season, but there was "still a lot of work . . . happening," and no evidence they took extended vacations or substantially reduced their hours during that time.

McPherson moved from the area manager position to the program manager position in part because she "could no longer bear the burden of the[ ] hours." She testified, "It was inhuman the amount of hours it required to have any kind of life." Area managers also were encouraged to recruit host families throughout the year and to get work for the summer season finished earlier in the spring.

The court heard testimony from EF representatives, plaintiffs, and former and current EF employees about the nature of plaintiffs' work. We can infer the court found credible plaintiffs' description of the amount of work their jobs required and their inability to take significant time off.

Moreover, the record simply does not show plaintiffs reaped the benefits that amici contend unlimited time off policies provide to employees.[18] In contrast to the hypotheticals amici pose, there is no evidence plaintiffs' schedule permitted—or EF would have approved—10 or 15 weeks off (or even three or four weeks at a time), significantly reduced hours during the off-peak season, or months of vacation spread throughout the off-peak season.

---

[18] Indeed, plaintiffs appear to have received fewer benefits under the "unlimited" time off policy than if the handbook's accrual-based vacation policy had applied to them. The record does not suggest plaintiffs took more time off than they would have accrued had they been subject to the handbook's policy. Under the handbook, plaintiffs would have been entitled to take 20 days' vacation after working for EHP for just one year. But there was no evidence plaintiffs ever took more than 20 days' vacation per year or that they would have had insufficient accrued time to take the vacations they did, had the handbook applied. Moreover, at the time of their terminations, plaintiffs would have been entitled to between five and six weeks' vacation per year (26 to 30 days). And, had they accrued vacation time they could not carry over, they would have been paid for it each year. Significantly, there is no evidence plaintiffs sought out or negotiated for "unlimited" paid time off as an employment benefit, as amici assert is the current trend.

The record thus supports a finding that EF's paid time off policy had an implied "cap" and was by no means "unlimited."[19] As the trial court said, an employer cannot avoid section 227.3 by leaving the amount of vacation time undefined in its policy while impliedly limiting the time actually available for approval.

  ii. *EF did not communicate the "unlimited" nature of its paid time off policy*

Substantial evidence also supports the trial court's finding that EF did not expressly convey the "unlimited" nature of its paid time off policy. In stark contrast to the accrual-based vacation policy in the EF handbook, which the parties agree did not apply to plaintiffs, EF conveyed its "unlimited" paid time off policy quite informally. According to the testimony, supervisors had a "side conversation" with newly hired area mangers to tell them about the vacation policy, or in some instances conveyed the policy by email. This is all plaintiffs were told: as area managers they could take paid vacation outside of the busy season, but their vacation did not accrue.[20] The only other parameters EF clearly told plaintiffs were (1) they had to notify their supervisor before taking time off and ensure they could complete their work, and (2) they did not need to track their days off in the online system because they did not accrue vacation.

---

[19]    In so concluding we do not suggest EF engaged in a subterfuge to avoid section 227.3 or that the trial court found it did so.

[20]    The testimony established area managers could take time off during the peak season in limited circumstances with advance approval. Brenden received advance approval for a one week cruise to Alaska to celebrate her 30th wedding anniversary one June, for example.

28

But no one at EF, for example, told plaintiffs they did not accrue vacation because they—unlike employees subject to the accrual policy—could take as much vacation as they wanted. Although plaintiffs understood they could take time off when their schedule permitted, they testified they did not understand the policy to be "unlimited," as EF contends it was.[21]

Heimann testified no one told her she had unlimited vacation or time off as either an area manager or the west coast manager. She said, "It would have been nice to know that." "It would have been nice to have been able to take as much time as other salaried employees that had the same tenure as myself." She knew she could take paid time off, but understood, "if I didn't use the time, that I would lose it." McPherson also testified she never was told she could "take as much vacation as [she] wanted." She said, "I would have loved to have had as much [vacation] as my operations manager was receiving." Former EHP employee Autumn Mostovoj, who supervised area managers at one point, also testified no one told her area managers were entitled to "unlimited vacation" or "unlimited time off at their discretion." In fact, she found the policy "so confusing and so vague" that she used the vacation policy in the handbook to guide her even though she knew it did not apply to EHP area managers.

If EF intended to limit plaintiffs' ability to earn vacation pay or treat their paid time off as something other than deferred

---

[21] Hart testified plaintiffs "were permitted to take as much or as little time off as they wanted." He clarified they could take as much time as they wanted "[w]ithin reason to be able to still perform the duties of the job," so as "[t]o not fall totally behind of their workload."

wages, its "unlimited" policy had to be express and clear. (Cf. *Owen, supra*, 175 Cal.App.4th at p. 470 [employer "*[b]y making it clear in advance* that vacation is not part of a new employee's compensation" did not "run afoul of the rule that prohibits an employer from reducing an employee's wages for services after the service has been performed" (italics added)]; *Minnick, supra*, 13 Cal.App.5th at p. 1007 [if "*clearly stated*" a policy that provides a waiting period before employee earns vacation is enforceable (italics added)].) It was not.

EF never expressly told plaintiffs that their ability to take paid vacation was not part of their compensation. EHP's 2000 and 2003 employee handbooks, "designed to address the unique needs of an at-home EF EHP employee," refer to "[f]lextime," but they do not mention paid time off or vacation as part of that flextime. The paragraph on flextime states: "Since AMs [area managers] and RDs [regional directors] work at home, they are not required to hold specific 'office hours.' Instead, hours are determined more by the seasonal nature of the product. As with all salaried employees, AMs and RDs work the necessary number of hours to complete their work successfully."[22] The paragraph does not tell employees they may take unlimited paid time off as part of that "flextime," or that their ability to do so is part of EF's promise to allow flextime, not a promise of additional wages. And, as exempt employees, area managers were not subject to overtime, but expected to work as many hours as needed "to complete their work successfully." EF may not have promised

---

[22] We understand this paragraph to refer to flexible daily hours, not an ability to take unlimited time off. For example, an area manager need not work the traditional 9:00 a.m. to 5:00 p.m., but could work during any hours in the day or night.

plaintiffs a specific amount of vacation time, but it promised them paid time off in *some amount*. Plaintiffs worked for EF in exchange for wages. Absent evidence to the contrary, under *Suastez*, those wages included the promised paid time off arising from the services they rendered during the year.

Moreover, EF's policy gave plaintiffs no clear direction as to their rights or EF's obligations under its "unlimited" paid time off policy. For example, EF did not warn plaintiffs of the consequences of failing to schedule a sufficient amount of time off, e.g., that they essentially would leave money on the table by working more hours for the same pay than those who scheduled more time off. (Cf. *Owen*, *supra*, 175 Cal.App.4th at p. 470 ["courts have approved employer vacation policies *that warn employees, in advance,* that they will cease to accrue vacation time accumulated in excess of an announced limit" (italics added)].) And its policy was not written down anywhere, so plaintiffs had nothing to consult. (See generally *Owen,* and *Minnick, supra*, 13 Cal.App.5th 1000 [affirming express, written vacation policies with waiting periods].)

Having failed to set out its purported unlimited vacation policy—or any limitations it imposed on earning vacation wages —in a clear, express writing (or otherwise), EF has not demonstrated that section 227.3 does not apply to its policy of providing paid vacation to plaintiffs. (See *Kirby, supra*, 53 Cal.4th at p. 1250 [courts must broadly construe employment statutes in favor of employees].)

c.  *Section 227.3 does not necessarily apply to all "unlimited" paid time off policies*

Amici assert unlimited time off policies—which they contend do not result in vested vacation pay—"offer significant benefits to both employees and employers." According to a 2019

31

study amici provide, "[u]nlimited paid time off" is the "emerging benefit" that interests employees most.

Amici explain, through persuasive hypotheticals,[23] how the unlimited policies they describe intentionally allow for different employees doing the same job to take varying amounts of paid time off so that each employee may organize his or her time differently. Some may work longer hours and on weekends to be able to take more frequent and longer vacations throughout the year, while others may take fewer and shorter vacations to avoid working evenings and on weekends. In industries with a defined season, like accounting, employees may take significant time off during the off-season, having worked long hours during the busy season. As amici note, under an unlimited time off policy, "[e]mployees are trusted to fulfill their job responsibilities and are otherwise free to come and go."

---

[23]     Amici posit a hypothetical unlimited-leave policy where attorneys in a law firm can take unlimited time off during the year as long as they bill 2,000 hours. In the example, one associate—devoted to skiing and surfing—averages nine hours of work a day, six days a week. At that pace, the attorney "can take 15 weeks of paid time off to ski and surf, and still meet his billable-hour budget." At the other end of the spectrum, another attorney—a parent with family demands—averages eight hours of work on weekdays and does not work on weekends. Because he chooses to work fewer hours to spend time with his family, it will take him 50 weeks to bill 2,000 hours, so he takes just two weeks of vacation. The attorneys obviously benefit from the described unlimited-leave policy: the surfer-skier can take more than three months of vacation every year—an amount unheard of in a traditional accrual policy—and the parent can work fewer hours each week, freeing up evenings and weekends, in lieu of taking more vacation that he most likely would have accrued under a traditional policy.

We appreciate the benefit and understand the appeal the unlimited time off policies amici describe may have to some employees.  In concluding section 227.3 applies to EF's vacation policy, we do not hold that section 227.3 necessarily applies to truly unlimited time off policies.  Such a policy may not trigger section 227.3 where, for example, in writing it (1) clearly provides that employees' ability to take paid time off is not a form of additional wages for services performed, but perhaps part of the employer's promise to provide a flexible work schedule— including employees' ability to decide when and how much time to take off; (2) spells out the rights and obligations of both employee and employer and the consequences of failing to schedule time off; (3) in practice allows sufficient opportunity for employees to take time off, or work fewer hours in lieu of taking time off; and (4) is administered fairly so that it neither becomes a de facto "use it or lose it policy" nor results in inequities, such as where one employee works many hours, taking minimal time off, and another works fewer hours and takes more time off.  Unlimited paid time off under such a policy—depending on the facts of the case—very well may not constitute deferred compensation for past services requiring payment on termination under section 227.3.

d.    *Substantial evidence supports the court's calculation of plaintiffs' vacation wages*

EF assigns several errors to the trial court's finding that "20 days of vacation vested annually for each plaintiff, and any unused portion is payable at termination."  Substantial evidence supports the court's finding.

i.    *The court's finding that 20 days of vacation vested annually was proper*

EF contends the court erred by determining how much vacation vested annually based on the amount of vacation

" 'actually available' " to plaintiffs. EF again relies on *McCarther* where the Supreme Court rejected the Court of Appeal's reasoning that an employer could calculate the amount of kin care required under section 233 based "on the amount of sick leave that the employee actually utilizes in one year." (*McCarther, supra*, 48 Cal.4th at pp. 112-113.) As we have discussed, the Legislature made clear its intent that kin care available under section 233 be precisely ascertainable, while section 227.3 includes no such limitation on determining the amount of paid vacation due under the statute. (*McCarther,* at p. 111 [Legislature intended to limit section 233 "to employers that provide a measurable, banked amount of sick leave," because the statute requires the amount of sick leave employers must allow employees to use for kin care to be calculated based on incrementally accrued time.].) We thus find *McCarther*'s holding inapplicable to section 227.3, which does not require the amount of annual paid vacation time to be precisely ascertainable from the employer's policy.

EF also argues the trial court arbitrarily chose the highest number of vacation days approved for one plaintiff and imposed its own policy judgment that EF should have expressly defined the amount of vacation plaintiffs could take. We reject EF's contentions. As the court said, EF's failure to define its vacation policy was "a problem of proof." Having concluded EF's policy was subject to section 227.3—a conclusion we affirm—the court had to determine the amount of vacation time that vested each year as plaintiffs worked. The court's consideration of the parties' conduct to determine that amount, where EF's policy did not expressly provide for it, was proper. (See, e.g., Civ. Code, § 1655 ["Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary

34

intention."]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 336-337 [absent express agreement, parties' conduct may evidence their understanding of particular employment terms, which "must be determined from the 'totality of the circumstances' "]; *Binder v. Aeta Life Ins. Co.* (1999) 75 Cal.App.4th 832, 852-855 [determining parties' implicit meaning of "good cause" based on circumstances and conduct where parties impliedly agreed to terminate employment only for good cause].)

In *Binder*, the employer agreed not to terminate the employee except for good cause, but there was no "particularized agreement" on what constituted good cause. (*Binder*, *supra*, 75 Cal.App.4th at pp. 852, 853-854.) The trial court, therefore, was required "to supply a meaning which [was] reasonable under the circumstances" by considering the parties' conduct and the surrounding circumstances. (*Id.* at pp. 852, 855.) The court had to do the same here. EF agreed to provide paid vacation to plaintiffs, but there was no "particularized agreement" on the amount of annual vacation to which plaintiffs were entitled. The court thus considered the parties' conduct and the circumstances to imply that term.

Substantial evidence supports the court's finding that EF impliedly agreed plaintiffs were entitled to at least 20 days' paid vacation annually under its undefined policy. EF's management expected area managers would take up to four weeks' vacation, and EF actually approved 20 days' vacation at least once. Moreover, as EF created the "problem of proof," the court's decision to calculate the amount of vested vacation time plaintiffs earned each year based on the maximum amount of paid vacation that had been approved was reasonable. (Cf. Civ. Code, § 1654 ["language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist"].

Because we conclude substantial evidence supports the court's finding that 20 days of annual paid vacation was available to plaintiffs, we need not reach the issue of whether the Legislature intended section 227.3's " 'principles of equity and fairness' " provision to apply in these circumstances.[24]

ii.     *The court did not err in calculating the amount of vacation wages EF owed plaintiffs*

Substantial evidence also supports the court's findings on the amount of vacation time each plaintiff actually used and the amount of vested time each had not used at the time of her termination.  The court assessed plaintiffs' credibility, considered the records submitted in evidence, and took into account failures of recollection elicited through cross-examination.  The court found Heimann's testimony particularly credible.  As for McPherson and Brenden, the court added eight days to the amounts of vacation each of them recalled they took each year to account for misrecollections.  Plaintiffs' testimony is not unbelievable to reasonable minds; thus, we are bound by the court's credibility determinations.[25]

_____

[24]     We do not find the court's decision not to apply the handbook (and the accrual caps) inequitable or arbitrary.  Had the handbook applied to plaintiffs, they would have received 20 days' vacation after one year and more than 20 days' vacation after their fourth year of service.  And, they would have been paid for any time they did not use and could not carry over.

[25]     EF contends plaintiffs have "invented" a standard to require vacation wages be paid when "there is a 'reasonably ascertainable floor and ceiling for vacation entitlement.' "  Amici contend the court's calculation method will result in setting an employer's liability for vacation wages on the amount of vacation its employees "chose to take" instead of its policy.  EF's and

36

### iii.    *Plaintiffs' vacation wages are not time-barred*

Finally, EF argues we should follow this district's decision in *Sequeira v. Rincon-Vitova Insectaris* (1995) 32 Cal.App.4th 632, 636-637, and find the statute of limitations bars plaintiffs' claim for vacation wages that vested more than four years before their termination. We are not bound by *Sequeira* and decline to follow it. As the parties note, more recent court opinions have held a plaintiff's cause of action for unpaid vacation wages does not accrue until the employee leaves her employment. (*Church v. Jamison, supra*, 143 Cal.App.4th at pp. 1572, 1576; *Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 391-392.) The trial court did not err when it followed *Church* and awarded plaintiffs vacation wages for the entire length of their employment.

### 3.    *On this record, section 206.5 precluded Brenden's general release from releasing her vacation wage claims*

When EF terminated Brenden's employment, she negotiated and received a severance payment equal to three months' salary ($11,362.50). The letter agreement Brenden signed included a general release of all claims, including those "under any federal or state labor . . . law[ ]," as well as an express waiver of her rights under Civil Code section 1542.[26]

Amici's contentions are unfounded. The court's approach to determine the amount of vested vacation time here was limited to the specific facts before it. We do not read the court's ruling, or plaintiffs' argument, to propose a standard to be applied to all "unlimited" vacation policies.

[26]    At the time, Civil Code section 1542 provided, "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of

The agreement also stated: "You acknowledge that you have received your salary through September 30, 2015. No additional payments will be due or made to you for salary, bonus, commissions, benefits, severance, vacation, personal days, or otherwise other than as specified in this agreement." EF contends this release Brenden signed as a condition of receiving her severance payment—a payment to which she was not otherwise entitled—bars her vacation pay claims, and as a matter of law section 206.5 thus did not invalidate the release.

Section 206.5 prohibits an employer from requiring an employee to release a claim for wages that are due and unpaid unless it has paid those wages. (§ 206.5, subd. (a).)[27] Section 206.5 thus provides an exception to a general release of wage claims—known or unknown. That exception is limited, however. Wages are not considered "due" under the statute if the employer and employee have "a bona fide dispute" as to whether they are owed. (*Chindarah v. Pick Up Stix, Inc.* (2009) 171 Cal.App.4th 796, 803 (*Chindarah*).) Section 206.5 therefore does not preclude an employer and employee from " 'compromis[ing] a bona fide dispute over wages.' " (*Chindarah,* at pp. 801, 803 [finding release valid and explaining that, although statutory right to receive overtime is unwaiveable, no statute prevents an employee from releasing "his claim to past overtime wages as part of a

_____

executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." (Stats. 2004, ch. 183, § 28.)

[27] Under section 206, "In case of a dispute over wages, the employer shall pay, without condition . . . all wages . . . conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled as to any balance claimed."

settlement of a bona fide dispute over those wages"].) Accordingly, an employer may obtain a valid release as part of a compromise of an employee's wage claim, without paying the full amount of wages claimed, if the employer has a good faith dispute that it does not owe the unpaid wages. (*Watkins v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1587 (*Watkins*).)

The trial court concluded Brenden's release was invalid under section 206.5 as to her vacation pay claims because "no vacation-pay dispute . . . was being settled at the time of the release." In other words, no bona fide dispute as to vacation pay existed *between* EF and Brenden. The court relied on *Watkins* in reaching its conclusion. There, another panel of this court found an employee validly released her wage claims when she "believed she possessed a claim for further overtime pay" and elected to receive "enhanced severance benefits" in exchange for releasing all her claims against her employer. (*Watkins, supra*, 172 Cal.App.4th at pp. 1586-1587.) The trial court here reasoned the court in *Watkins* "would have no reason to emphasize the employee's belief that she possessed an overtime pay claim if that belief were not required for a valid release. That requirement makes some sense, in that otherwise an employer could—with regard to any employee—pay all the wages that it believed 'due' as consideration for a broad waiver of all other claims."

We agree. California courts may "routinely enforce releases of disputed wage claims" as EF contends, but as plaintiffs note, in those cases the releases arose from pending wage disputes or litigation where *actual controversies* existed between the parties. (*Watkins, supra*, 172 Cal.App.4th 1576; *Chindarah, supra*, 171 Cal.App.4th at p. 803; *Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 569, 589 [court-approved settlement of wage claims applied to later litigation of same cause of action]; *Nordstrom Com. Cases* (2010) 186

Cal.App.4th 576, 579 [court-approved settlement of commissions claims]; *Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 564-565, 578 [enforcing one plaintiff's release of all claims made while lawsuit for reporting time and split-shift wages was pending where releasing plaintiff argued " 'she was undisputedly entitled' " to reporting time and split-shift pay, but defendant disputed the claims]; *Shine v. Williams-Sonoma, Inc.* (2018) 23 Cal.App.5th 1070, 1077 [plaintiff collaterally estopped from bringing reporting-time pay claim against employer based on settlement of earlier-filed class action for failure to provide meal and rest periods, overtime and minimum wages, timely wages, and final paychecks because reporting-time claim—which is a claim for wages due—could have been raised in earlier action and employer disputed it owed reporting-time pay].)

EF contends the trial court's own findings that EF had a good faith dispute as to whether it owed vacation wages, and its payment to Brenden of "the amount of wages that it conceded was due at the time," takes Brenden's release outside of section 206.5 as a matter of law. We disagree. The court's finding of a "good faith dispute" concerned its conclusion that waiting time penalties under section 203[28] were unwarranted because EF

---

[28] An employer who willfully fails to pay an employee her wages after her employment ends must continue to pay the wages in the form of waiting time penalties. (§ 203, subd. (a); Cal. Code Regs., tit. 8, § 13520.) Waiting time penalties cannot be assessed against an employer who has "a good faith dispute that any wages are due," however. (Cal. Code Regs., tit. 8, § 13520.) For purposes of section 203, an employer has a " 'good faith dispute' " if it "presents a defense, based in law or fact which, if successful, would preclude any recovery" by the employee. (Cal. Code Regs., tit. 8, § 13520, subd. (a).)

"had a good faith dispute as to whether vacation wages were due" given the "absence of on-point authority about undefined-amount vacation policies." In other words, the trial court concluded EF did not willfully withhold wages from plaintiffs, including Brenden.

That finding, however, does not require us to conclude a bona fide dispute over wages existed for purpose of determining if section 206.5 invalidated Brenden's release of her vacation pay claims. A "dispute" is "[a] conflict or controversy . . . ." (Black's Law Dict. (11th ed. 2019) p. 593.) It necessarily requires two competing sides. So, for there to have been a releasable bona fide "dispute" over Brenden's vacation wages, there must have been a disagreement between the parties about her right to those wages. But when Brenden signed the severance agreement neither she nor EF knew EF owed her unpaid vacation wages. No conflict existed between them over vacation pay or any other earned, but unpaid wages, for that matter. There is no evidence that— during the severance payment negotiations or when she signed the release—Brenden asserted an entitlement to vacation wages that EF disputed or that EF told Brenden she was not entitled to vacation wages that she asserted were owed.

The opening paragraph of the severance agreement confirms it was not a settlement of a disputed wage claim: "We want you to know that your work here has been appreciated and in order to assist you as you make the transition to new employment, we would like to offer you the following package." Paragraphs containing the severance payment, release, and other provisions follow. The release is made "[i]n exchange for salary continuation," but nowhere does the agreement state its purpose includes resolving a wage dispute between the parties. (See, e.g., *Reynov v. ADP Claims Services Group, Inc.* (N.D.Cal., Apr. 30, 2007, No. C 06-2056 CW) 2007 U.S. Dist. Lexis 31631 at p. *3

41

(*Reynov*), relied on by EF [agreement's stated purpose to provide employee " 'certain benefits that you would not otherwise receive, and resolve any remaining issues between you and [employer]' "].) Hart even increased Brenden's severance payment from two months' to three months' salary after Brenden asked him, "Can you see it in your heart to give me three months['] salary?"

In other words, Brenden did not accept the severance payment after negotiating "the consideration [she was] willing to accept in exchange" for her release of "claims for disputed wages." (*Nordstrom Com. Cases, supra,* 186 Cal.App.4th at p. 590 ["Employees may release claims for disputed wages and may negotiate the consideration they are willing to accept in exchange."].) Because Brenden released a claim for past wages EF owed her where no *dispute* over those wages existed, the trial court did not err in finding the release void as to her vacation pay claim under section 206.5.

We do not find Brenden's release is invalid in any other respect. We also do not hold a subjective belief in or enumeration of the specific wage claim necessarily is required at the time an employee signs a release of wage claims.[29] We reject EF's

---

[29]    For example, in one of the unpublished federal cases on which EF relies the district court found a general release valid as to an employee's allegedly unknown overtime claim based on his misclassification as an exempt employee. (*Reynov, supra,* 2007 U.S. Dist. Lexis 31631.) Although there was evidence the employee was aware of his overtime claim, the court found the employee's claimed lack of knowledge did not invalidate the release because the employer's defense that the employee was exempt and not owed overtime created a good faith dispute. (*Id.* at p. *10 & fn. 4.) There, however, the employee had complained to an attorney about the employer's " 'Labor Code

contention that finding the release here void under section 206.5 will result in nullifying express waivers of Civil Code section 1542. An employee may agree to waive her rights and release unknown claims to settle a bona fide disagreement over whether her employer owes her wages. Based on the existing case law, however, there must exist at least a "bona fide" or "good faith" dispute *between* the parties at the time the employee releases a claim for past wages for the release to be valid under section 206.5.

We also conclude the trial court did not err when it found EF not entitled to an offset of Brenden's damages for the severance payment. As plaintiffs contend, EF may enforce the general release as to non-wage claims not affected by section 206.5. The court reasonably could conclude the consideration EF paid Brenden also purchased the release of nonwage claims—age discrimination or contract-based claims, for example—and thus no offset was required.[30]

---

Violations,' " and preemptively retained the attorney to represent him " 'in all claims for violations of the Labor Code and any other related laws' " against the employer a month before quitting his job and signing the release in issue in exchange for a severance. (*Id.* at p. *3.) An actual dispute over whether the employer violated the Labor Code thus existed between the parties. The employer also paid the severance in part to "resolve any remaining issues" between it and the employee. (*Id.* at p. *3.)

[30] Although the trial court did not decide the issue, as Brenden argued to the trial court and argues on appeal, EF also waived its defense of offset by failing to plead it as an affirmative defense in its answer. (*Walsh v West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532, 1546 [answer must plead as an affirmative defense any matter " 'not put in issue

43

**4.** ***The trial court erred when it found section 227.3 applied to Heimann after she moved to Virginia***

EF appeals from the judgment awarding Heimann vacation wages on the separate ground that section 227.3 did not apply to her after she moved to Virginia in 2005. EF thus argues that, if we affirm the trial court's finding that section 227.3 applied to EF's unlimited paid time off policy, Heimann's damages award must be reduced to exclude vacation wages earned after she moved. Although substantial evidence[31] supports the trial court's factual findings that Heimann's work "focused on activities and people actually in California," and she temporarily resided in California for "weeks or months consecutively,"[32] we conclude

---

by the plaintiff,' " or " 'not responsive to essential allegations of the complaint' "].)

[31] Heimann testified she moved to Virginia in June 2005, where she continued to work as EHP's west coast manager until she retired in October 2014. She managed a staff located in California, who helped her collect money from students for their optional trips. Heimann opened and maintained for EHP a California bank account where hundreds of thousands of dollars were deposited for the trips. She also supported EHP programs in Washington and Vancouver, but 90 percent of her job focused on groups in California.

Heimann worked from her home in Virginia, but returned to California annually for the busy summer season. EHP paid for Heimann to live in a dormitory at California State University Long Beach (CSULB) or a hotel. She also had an office at CSULB, where the EHP program was held. Each summer she hired two or three seasonal employees whom she managed in California.

[32] Heimann worked in California for two to two and one-half months consecutively during the summer, from mid-June

44

the court erred in its application of *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191 (*Sullivan*) to find section 227.3 applied to Heimann after she became a Virginia resident.

California's Legislature expressly has declared that "[a]ll protections, rights, and remedies available under state law . . . are available to all individuals regardless of immigration status . . . who are or who have been employed, in this state."  (§ 1171.5, subd. (a); *Sullivan, supra*, 51 Cal.4th at p. 1198.)  Although the Legislature enacted section 1171.5 to protect undocumented workers "from sharp practices," our Supreme Court has interpreted that section as expressing the Legislature's desire to protect all individuals employed in the state regardless of their residency.  (*Sullivan*, at p. 1997 & fn. 3 ["no reason exists to believe the Legislature intended to afford stronger protection under employment laws to persons working illegally than to legal nonresident workers"].)

In *Sullivan*, our Supreme Court answered certified questions from the United States Court of Appeals for the Ninth Circuit "about the applicability of California law to nonresident employees who work both [in California] and in other states for a California-based employer."  (*Sullivan, supra*, 51 Cal.4th at p. 1194.)  After performing a conflict-of-laws analysis, the Court held California's *overtime law* applied to nonresident employees who performed full days and weeks of work in California.  (*Sullivan, supra*, 51 Cal.4th at pp. 1201, 1206, italics added.)  In so holding, the Court examined California's "strong interest

---

through late August.  She also traveled to California for meetings in January or February and in April or September.  She spent days or weeks in California in total outside the summer season.

45

in governing overtime compensation for work performed in California." (*Id.* at p. 1201.)

The Court cautioned that, although it had found California's overtime laws applied to nonresidents performing work within California's borders, "one cannot necessarily assume the same result would obtain *for any other aspect of wage law.*" (*Sullivan, supra*, 51 Cal.4th at p. 1201, italics added.) The Court explained, "California's interest in . . . an out-of-state business's . . . treatment of its employees' vacation time, for example, may or may not be sufficient to justify choosing California law over the conflicting law of the employer's home state." (*Ibid.*)

In concluding section 227.3 applied to Heimann, the trial court agreed *Sullivan* did not mean to apply California wage laws to "all work with some connection to California," but found "the standard [was] not so high that the employee's work must be 'entirely' in California." *Sullivan*, however, does not support the court's implicit finding that California wage laws should be applied to work performed *outside* of California by a *nonresident* even if that work is "focused on activities and people actually in California." Indeed, *Sullivan* reached the opposite result. Although the Court held California's overtime law applied to overtime work the nonresident plaintiffs performed in the state, it also held California's unfair competition law (UCL) did not apply to "overtime work performed outside California for a California-based employer by [the] out-of-state plaintiffs." (*Sullivan, supra*, 51 Cal.4th at pp. 1208-1209.) The Court concluded neither the language of the UCL nor its legislative history indicated the Legislature intended the UCL to apply to " ' "occurrences outside the state." ' " (*Id.* at p. 1207.)

As with the UCL, "[n]either the language of [section 227.3] nor its legislative history provides any basis for concluding the Legislature intended [section 227.3] to operate extraterritorially."

46

(*Sullivan, supra*, 51 Cal.4th at p. 1207 [presumption against extraterritorial application of state law].)  Most of Heimann's work may have been to support programs in California, but as a Virginia resident she did not *perform* most of her work in California.  Based on the record, *at most* Heimann worked in California for about 12 to 13 weeks per year—about two months or so in the summer and additional days, or perhaps a week at a time, in January or February and in April or September.  She thus spent *at least* 75 percent of her time performing work in Virginia from June 2005 to October 2014.

At a minimum, therefore, section 227.3 does not apply to work Heimann performed in Virginia or in any other state outside of California.  (*Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214, 222 (*Norwest Mortgage*) ["we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute"].)

That leaves the question of whether section 227.3 applies to vacation time Heimann earned during the time she temporarily worked in California each year.  No California decision has considered whether section 227.3 applies to a nonresident employee of a non-California employer who periodically worked in California.  In ruling section 227.3 applied to all work Heimann performed for EHP while a Virginia resident, the trial court overstated *Sullivan*'s description of California's interest in applying its wage laws.  Quoting from *Sullivan*, the trial court stated, " 'California has, and has unambiguously asserted, a strong interest in applying its [wage and hour] law . . . to all work performed, within its borders.' "  The trial court replaced "overtime" with "wage and hour" and omitted "to all nonexempt workers."  Our Supreme Court actually declared, "California has, and has unambiguously asserted, a strong interest in applying its

47

overtime law to all nonexempt workers, and all work performed, within its borders."  (*Sullivan, supra*, 51 Cal.4th at p. 1203.)

The trial court's substitution and omission change the meaning of the quotation.  The statement referred only to California's asserted interest in applying its *overtime* laws to all *nonexempt* workers performing work in the state—not *all* of its wage and hour laws to *all* work performed in the state.  Moreover, earlier in its opinion the Court expressly stated it was not deciding "the applicability of any provision of California wage law other than the provisions governing overtime compensation."  (*Sullivan, supra*, 51 Cal.4th at p. 1201.)  The Court also found "of doubtful validity" the employer's "assumption that, if out-of-state employers must pay overtime under California law, they must also comply with every other technical aspect of California wage law," including "the accrual and forfeiture of vacation time."  (*Id.* at pp. 1200, 1202.)

We share the Court's doubt.  We cannot conclude California intended section 227.3—a law that governs the payment of unused vested vacation time when an employee's employment *ends*—to apply under the circumstances here:  where a nonresident, exempt employee of a non-California employer has periodically performed work within California, has received no California wages, and has paid no California income taxes on any wages earned.

First, we do not believe California has an interest in ensuring an employee who voluntarily leaves California to become a resident of another state is paid vacation wages at the end of her employment by a non-California employer when

48

she worked temporarily within the state.[33]  Heimann was not
a California wage earner from mid-2005 until her retirement.
She described herself as "relocating" to California every summer.
But the record does not support a finding that Heimann was a
part-time resident of California as she and the trial court seem to
imply.  For purposes of the Revenue & Taxation Code, a resident
is an individual in the state "for other than a temporary or
transitory purpose."  (Rev. & Tax. Code, § 17014, subd. (a)(1).)
An individual in California "to complete a particular transaction,
or perform a particular contract, or fulfill a particular
engagement," requiring her presence here for "a short period,"
is considered in the state for a temporary or transitory purpose.
(Cal. Code Regs., tit. 18, § 17014, subd. (b).)  The Franchise Tax
Board gives the example of an executive who lives in New York
with his family, but travels to California for business for one
or two weeks at a time, for a total of six weeks a year, as a
nonresident.  (Cal. Franchise Tax Bd., Pub. No. 1031, Guidelines
for Determining Resident Status (2018), at p. 5.)  Essentially,
"the state with which a person has the closest connection during
the taxable year is the state of his residence."  (Cal. Code Regs.,
tit. 18, § 17014, subd. (b).)

Heimann gave up her status as a California resident
when she moved to Virginia.  She lived in California during the
summer for a particular, limited business purpose—to oversee
student trips for the summer program.  EF paid for Heimann

---

[33]    We do not suggest that California's interest in protecting
its employees from forfeiting vacation wages is not a strong one.
We simply conclude there is no indication that California
intended to apply its vacation pay law under these
circumstances.

to stay in a hotel or a dormitory for the summer. She did not maintain a home in California or own any property here. Heimann had her mail temporarily forwarded from Virginia to California each summer, but there is no evidence she permanently changed her address or residence status. She also gave up her California driver's license and registered to vote in Virginia after she moved. Heimann opened and maintained a California bank account on behalf of EHP as part of her job, but nothing in the record shows she had a personal bank account in California after she moved. There is no evidence that Heimann maintained any close ties to California after she moved so that she could be considered a "resident" for part of the year.

Moreover, a part-time resident must pay California taxes on all income earned while a California resident, regardless of source, and on income earned from California sources while a nonresident.[34] (Rev. & Tax Code, §17041, subd. (i)(1)(A) & (B) [tax imposed on part-time residents and nonresidents].) If Heimann were a part-year California resident, as she seems to contend, she would have been required to pay California income taxes on income she earned from EF during her California stay. She did not.[35] It is undisputed that (1) Heimann was not paid

---

[34] Heimann received no wages from a California source— her income from EF was from a Massachusetts source. (Cf. *Appeal of Blair S. Bindley* (Cal. OTA, May 30, 2019, No. 2019-OTA-179P) 2019 WL 3804280, at pp. *1, 3, 6-7 [self-employed Arizona resident who performed work in Arizona for California LLC's had taxable California-source income].)

[35] Heimann testified she did not pay California income tax on income earned after she moved and did not file a California

50

California wages for work she performed here while a Virginia resident; (2) she has not paid California income taxes since the 2005 tax year; and (3) she has paid Virginia state income tax on her wages since 2005.

Nor was Heimann operating under a California employment contract after she moved to Virginia. EHP retained its area managers (including the west coast manager) from year to year, orally informing the manager about the company's intent to retain her, followed up with a letter agreement. Heimann testified she usually (but not always) received offer letters for her west coast manager position annually. The record includes an October 2007 offer letter from EHP's director of operations in Massachusetts sent to Heimann at her Virginia address, confirming her salary for that fiscal year. Nothing in the record, however, demonstrates Heimann received or accepted her annual employment renewal in California after 2005 so that she would have expected California law to apply to her employment after she moved.

The exclusion of a nonresident, temporary worker from section 227.3 does not implicate the same concerns as the exclusion of nonresidents from California's overtime laws. Although section 227.3 serves the important goal of ensuring California workers do not forfeit vacation wages when their employment ends, it does not protect workers' and the public's health and safety or "expand[ ] the job market by giving employers an economic incentive to spread employment throughout the workforce" as do California's overtime laws.

tax return after the 2005 tax year. At oral argument counsel confirmed Heimann never paid California income tax after she moved to Virginia.

(*Sullivan, supra*, 51 Cal.4th at p. 1198.)  As the *Sullivan* Court explained, "[t]o exclude nonresidents from the overtime laws' protection would tend to defeat their purpose by encouraging employers to import unprotected workers from other states." (*Ibid.*)  No such concern exists with section 227.3 on the facts here.  EF did not "import" Heimann to work in California to avoid section 227.3.  Heimann voluntarily moved from California, and EF let her keep her position even though it meant having to pay for Heimann to stay in California during the summer.

California's overtime law and vacation pay law also apply differently to nonresidents as a practical matter.  California's wage laws governing nonexempt employees—overtime, meal and rest breaks, etc.—apply as the employee performs work within the state.  The moment the nonresident employee has worked more hours in a day or week than permitted, the overtime law's application is mandatory unless a statutory exception applies. (§ 510, subd. (a).)  Nor may the employee and employer contract around the right to overtime.  (*Sullivan, supra*, 51 Cal.4th at p. 1198, citing § 1194.)

The right to paid vacation, on the other hand, is governed by contract.  California does not require employers to provide paid vacation to employees.  (*Owen, supra*, 175 Cal.App.4th at p. 468.)  Thus, section 227.3 does not come into play unless (1) the employer's contract or policy provides employees paid vacation, (2) the employee's employment has terminated, and (3) the employee has unused, vested vacation time.  An employer, therefore, will not know if it must pay unused vacation wages under California's law to a non-California employee until she quits, retires, is laid off, or is fired, and that may not happen until long after the employee has performed any work in California.  By contrast, an employer can determine immediately whether California's overtime law is implicated.

52

It simply is not practical to require a non-California employer to apply section 227.3 to a non-California resident who periodically works in California. As EF notes, applying section 227.3 in these circumstances would create an administrative nightmare the Legislature surely could not have intended. For example, an employer whose employee works on projects in different states not only would have to keep track of how much proportionate vacation time the employee earned in each state based on how long she worked in that state, but also treat those portions of vested vacation time differently depending on the law of the state where the vacation vested.

The employer also would have to determine which earned vacation days from which state the employee had used. Let's assume an employee earned three weeks of vacation based on work performed in the state of Virginia, earned one week of vacation based on time worked in California, took one week of vacation that year, and then retired. Does the employer owe the employee nothing under section 227.3 because the employee used up the one week of vacation earned while in California? Or, must the employer split the used week between the time earned in California and in Virginia so that a portion of that week is considered unused and owing to the employee under section 227.3? How would the employer decide whether the employee had any unused vacation pay earned from work in California when her employment ended? Applying section 227.3 under these circumstances would require the Legislature or courts to become involved in the administration of a non-California employer's contractual vacation policy with nonresidents. We do not find this tenable.

These practical problems simply do not arise from *Sullivan's* application of an hourly wage law to nonresidents temporarily working in the state. An employer like that in

53

*Sullivan* could not be faced with applying two different overtime laws to an employee because the employee obviously cannot perform the same hours of work in two different states.

Because we conclude section 227.3 does not apply to vacation Heimann earned, but did not use, after she moved to Virginia in 2005,[36] we need not engage in a conflict of laws analysis. (See *Norwest Mortgage, supra,* 72 Cal.App.4th at p. 228.)

Accordingly, Heimann's damages for unpaid vacation wages must be reduced by the amount of vacation time she earned, but did not use, after she became a Virginia resident.

5. ***Substantial evidence supports the trial court's finding that EF terminated McPherson's employment on November 6, 2015***

EF also appeals from the judgment awarding McPherson her unpaid salary for November 1 through 6, 2015. EF contends

---

[36] In any event, Heimann did not meet her burden to prove she had any unused, vested vacation pay arising from work she performed in California after she moved to Virginia. She presented no evidence the vacation time she earned but did not use was attributable to the proportion of vacation time she earned while working in California from mid-2005 through 2014. At most, Heimann earned a week (five work days) of vacation based on the roughly 12 weeks she spent in California. (Twelve weeks is almost 25 percent of a 52-week year, and 25 percent of 20 days of annual vacation is five days.) Based on Heimann's estimates, the *least* amount of annual vacation she took from 2005 to 2014 was nine days—more than the maximum number of days she could have earned proportionally from the time she spent in California each year. Accordingly, if EF first applied the vacation time Heimann earned from work in California to what she used each year, Heimann would have no unused, vested vacation time to pay out during that period.

the award must be reversed because (1) McPherson's one-year program manager position expired on September 30, 2015, the end date stated in her offer letter, which coincided with the end of EF's fiscal year, and (2) McPherson performed no work during November. The trial court concluded McPherson was terminated not on September 30 but on November 6, 2015. Substantial evidence supports the trial court's findings and judgment in McPherson's favor.

EF contends McPherson's employment automatically ended on September 30 because it was a "fixed-term employment contract." EF relies on *Schimmel v. NORCAL Mutual Ins. Co.* (1995) 39 Cal.App.4th 1282, 1285 (referring to nature of fixed-term employment contract in considering question of tort liability for nonrenewal of a fixed term insurance policy). *Schimmel* cited section 2920, which provides "employment is terminated by . . . [¶] [e]xpiration of its appointed term." Here, however, the trial court concluded that—based on EHP's conduct—"an objective employee in McPherson's position would have concluded she was still employed" after September 30. The court heard extensive testimony and considered several exhibits on this issue. We infer it resolved any credibility issue in McPherson's favor. The evidence, summarized below, supports the court's findings.

McPherson admitted the program manager position was a fixed, one-year trial position that would end on September 30, 2015. She also understood, through conversations with EHP management, that she and EHP would evaluate the pilot program at the end of the year to decide whether to continue it. On September 15, 2015, after Hart told McPherson there was no budget to continue the program manager position, he invited her to propose a different position for the 2015-2016 fiscal year. She did so by email two days later. On September 23, 2015, Hart left McPherson a voicemail message that he needed more

time to review her proposal.  He said, " 'Terri, I wanted to let you know if the answer were "no" you would have heard it by now.' " He hoped she had not looked for another job and told her to " 'hang tight.' "  He hoped his message had "put[ ] [her] at ease." We conclude, a reasonable person would—as McPherson did— consider this statement from EHP's president a confirmation that EHP was in fact considering her proposal to continue her employment for the 2015-2016 year.

McPherson sent Hart an email telling him she could wait. In the weeks that followed, McPherson continued to do some work, held off on looking for another job, and emailed Hart more than once asking about her status.  He did not respond.  Nor did EHP tell McPherson her employment would terminate on September 30, 2015.  McPherson never saw an email announcing her termination, as EHP had done when other employees left. EF continued to pay McPherson's salary in October 2015, although Hart testified the payment was an "oversight."  Hart did not affirmatively tell McPherson there was no budget to keep her on in a different position for the 2015-2016 season until November 6, 2015.  As the trial court found, before that date EHP acted as if McPherson remained employed while EHP considered whether it was able to extend her employment.

Moreover, the record demonstrates EHP did not have a practice of letting its employees' (or at least area managers') employment automatically terminate at the end of the fiscal year. For example, when McPherson's position changed from area manager to program manager, she was not terminated and then rehired.  She remained employed after September 30 even though she did not receive her employment letter for the program manager position until December 1, 2014.  Before McPherson became a program manager, she received letters each year renewing her employment for the next fiscal year.  The letters

56

often did not arrive until October, November, or December. Instead, before the end of the fiscal year, EHP let McPherson know whether her contract would be renewed. Hart also confirmed it was customary to renew area managers' contracts after the fiscal year's end.

Given the parties' discussion of the possibility of another position, Hart's assurances, EHP's practices surrounding the renewal or nonrenewal of annual contracts, and EHP's continued payment of McPherson's salary, the trial court reasonably concluded EF did not terminate McPherson's employment until November 6, 2015, when it told her it was doing so.

We also reject EF's contention that McPherson is not entitled to her wages from November 1 to 6, 2015, because she was on vacation in New Orleans and performed no work. As noted, the trial court reasonably concluded McPherson's employment did not end until November 6. Under EF's paid time off policy, McPherson was required only to notify her supervisor when she wanted to take time off, unless it was the busy season. November was not the busy season, and McPherson informed Hart of the days she was taking off and where she was going. That time was legitimate paid time off, according to EF's policy, for which McPherson was not compensated.

### 6. *The attorney fees award*

EF contends that, if we reverse part of the judgment, we also must reverse the court's postjudgment order awarding plaintiffs attorney fees. Although EF did not file a notice of appeal from that award—and thus we lack jurisdiction to review it—"this does not mean that an award of attorney fees to the party prevailing stands after reversal of the judgment." (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284; see *Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1233-1234 [reversing postjudgment order awarding attorney fees

57

because court could not "say with certainty that the [trial] court would exercise its discretion the same way" in light of partial reversal of judgment].)  Rather, " '[a]n order awarding costs falls with a reversal of the judgment on which it is based.' "  (*Allen*, at p. 1284.)  Accordingly, the trial court should consider whether to modify the attorney fee award in light of our partial reversal of the judgment as to Heimann.

## DISPOSITION

The judgment is reversed in part as to the amount of damages awarded Heimann for unpaid vacation wages. We remand the matter to the trial court with directions to (1) recalculate Heimann's damages and prejudgment interest by excluding from that award any unused vacation time that vested after she moved to Virginia in June 2005; and (2) conduct further proceedings on whether to modify the attorney fee award in light of our partial reversal of the judgment.  The judgment is affirmed in all other respects.

The parties are to bear their own costs on appeal.


CERTIFIED FOR PARTIAL PUBLICATION



EGERTON, J.

We concur:



LAVIN, Acting P. J.                    DHANIDINA, J.


58